RELIANCE ELEVATOR COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Mary Lou Ruzkowski, Widow of Jerome J. Ruzkowski, Deceased, Appellee).

First District (Industrial Commission Division)   No. 1—91—2582WC

Opinion filed May 15, 1992.—Rehearing denied September 17, 1992.

Richard F. Pellegrino, Ltd., of Chicago, for appellant.

Cronin & Peters, of Chicago, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, Mary Lou Ruzkowski, filed an application for adjustment of claim for widow's benefits pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*) (the Act), following her husband's, Jerome Ruzkowski's (the decedent's), death while employed by the respondent, Reliance Elevator Company. The arbitrator found that the decedent's death arose out of and in the course of his employment and awarded the claimant benefits under the Act. On appeal, the Industrial Commission (the Commission) affirmed the arbitrator's decision, and the circuit court confirmed the Commission's decision. The respondent appeals.

The sole issue presented on appeal is whether the Commission's determination that the decedent's death arose out of and in the course of his employment was against the manifest weight of the evidence. We affirm for the reasons set forth below.

At the arbitration hearing, the claimant testified that she was married to the decedent on March 23, 1989. On that date, the decedent appeared to be in good health when he left for work that morning. At the time of the decedent's death, he had been employed by the respondent for three or four years, but he had worked in the elevator business for approximately 36 years.

In summarizing the decedent's past medical history, the claimant testified that the decedent had had gallbladder surgery a little over a year prior to his death, and that the surgery had been performed by Dr. Haun at Lutheran General Hospital. She stated that the decedent carried medication for headaches on his person. She further explained that the decedent had taken Zantac for a stomach condition, and that

Dr. Lewis, the decedent's family physician, had prescribed Valium for nervousness. She denied that the decedent had been treated for a heart condition, or that he had been diagnosed as having a congestive heart problem.

James Neiweem, an officer employed by the Wilmette police department, testified that he was on duty on March 23, 1989, and that he had been summoned to Mallinckrodt College (the College), the scene of the decedent's death. Upon his arrival at the College, he went to the elevator room on the fourth floor, where he saw the decedent lying facedown on the floor. Officer Neiweem described the room as being 10 feet by 18 feet in size, with half of the floor of the room raised approximately two feet from the other half of the floor and upon which the electrical-control panel for the elevator was located. The decedent was found on the lower level of the floor, about three to four feet from the control panel. A screwdriver lay about a foot away from the decedent on the floor, and a tool pouch was upon the raised platform less than two feet from the control panel. Also in front of the control panel, on the raised portion, was a folded towel which the officer assumed to be a kneeling pad. Officer Neiweem observed that the electrical-control panel was on and that the electrical current was "arcing" between two contacts on the panel.

Officer Neiweem recalled that the decedent had an abrasion to his right eye, which the officer believed could have been caused when the decedent fell off of the platform area. Officer Neiweem admitted on cross-examination that he had seen a person electrocuted before but that there were paramedics working on the person at the time and he did not have a good view of the person. Officer Neiweem did not see any burn marks on the decedent.

Edward Rudek testified that he was working for the respondent on March 23, 1989, as a maintenance supervisor, and that he had been in the elevator business most of his life. Currently, he was employed by Otis Elevator Company as the superintendent of the modernization department, but at the time of the decedent's death, he was the decedent's supervisor. He stated that on the date of the decedent's death, the decedent worked as a maintenance mechanic for the elevators, and that the decedent was at the College to perform routine maintenance. In performing routine maintenance on an elevator, a maintenance mechanic would contact the person in charge of the building, such as a building engineer, and would then go to the machine room and check the equipment and the lubricants. Rudek himself had done routine maintenance on elevators in the past. Rudek explained that the job sometimes required the mechanic to put his hands into the

equipment to work on it, and that he had received electrical shocks many times while performing routine maintenance on an elevator.

Rudek went to the scene of the decedent's death, and when he arrived, the decedent was lying on the floor on the left side of the room. Rudek stated that the control panel was on the right side of the room "on the deck." Rudek further stated that the decedent's tool pouch was on the deck, a rag was laying there, and there was no cover on the control panel.

Rudek testified that he is a member of a union and that every month there is something about accidents involving elevators in the literature provided by the union. These articles included electrical accidents, and in the past five or six years, there had been two or three electrocutions in the Chicago area. Rudek considered this to be a hazard of the job.

Rudek stated that he had known the decedent for about 28 years. On cross-examination, he admitted that he had hired the decedent for the respondent and that he was friends with the decedent and his family. He also admitted that during his employment with the respondent, he had had problems. He admitted that he had been "kind of like" demoted and had had a pay decrease while working for the respondent, and this had made him angry. He stated that he had never seen anyone electrocuted on the job.

The claimant presented the evidence deposition of Dr. Margarita Arruza, deputy medical examiner for the office of medical examiner of the County of Cook. She testified that she had investigated the decedent's death for the medical examiner's office and that her investigation consisted of reviewing the report of the investigator's findings of the circumstances surrounding the decedent's death, going to the scene of the decedent's death, and doing a postmortem examination of the decedent.

In her examination of the decedent's body, she found that the decedent had congestive cardiomyopathy, a 25% to 50% occlusion of the coronary arteries, and some abrasions on the forehead, right eye, cheek and forearm. She stated that the decedent was 56 years of age, was overweight and had a sick heart. Dr. Arruza explained that congestive cardiomyopathy is associated with decreased cardiac output, and the heart muscle becomes weaker and thinner. Some of the symptoms of this condition are fatigue and shortness of breath. A person with this condition might go on for a number of years with the disease and never experience any symptomology. She found that the decedent's myopathy was a preexisting condition.

Dr. Arruza testified that the 25% to 50% occlusion of the decedent's coronary arteries was not significant, as anything below a 70% occlusion does not have a physiological consequence on the blood flow. The doctor found no evidence that the decedent had had a prior myocardial infarction. Dr. Arruza admitted that the decedent could have suffered a cardiac arrest or death from his cardiac disease; however, it was her opinion that he had suffered a low-voltage electrocution, and that his heart disease made him more susceptible to electrocution, *i.e.*, low-voltage electrocution to a diseased heart will cause more damage.

Dr. Arruza was advised that the voltage of the control panel at the College was 220. She stated that this was more than enough voltage to kill a person. Dr. Arruza was unable to find any burn marks at an entrance or exit wound on the decedent, but she did not find this surprising as none would be apparent in a low-voltage electrocution. Dr. Arruza admitted that she had no "proof" of electrocution, *i.e.*, burn marks, but she stated that "there are tons of articles where they tell you low voltage electrocutions, you got to go by your circumstances. You're not going to find burns. You're not going to find anything significant in your autopsy. You got to look at what happened and see if it's possible. And if it's possible, that's that, and that's my opinion."

Donald Miller testified on behalf of the respondent. He stated that he had been vice-president of field operations for three years, and, prior to that, he was a maintenance supervisor. On March 23, 1989, he went to the College with Rudek. He corroborated Rudek's testimony regarding the location and appearance of the decedent's body. He, too, had never seen anyone electrocuted on the job, but he was aware of the literature from the union which contained information on electrocution and safety. He also confirmed that there was no cover on the control panel of the elevator at the College, but this was not abnormal given the vintage of the elevator. The elevator at the College was designed by Otis in the 1920's. He further stated all parts of the control panel carried electricity, and with the right combination, it was possible to receive a shock from the panel.

Dr. Gerald H. Lewis testified in his evidence deposition that he had treated the decedent since March 1987. On March 9, 1987, Dr. Lewis saw the decedent for the first time, and at this visit, the decedent complained of feeling fatigued, of having a flushed feeling, and of having blurred vision. In his examination of the decedent, he found the decedent to have a heart murmur, which he stated was of no significance, and the rest of the examination was normal. When the de-

cedent came to the doctor for treatment, the decedent was already taking the medications of Maxzide and Valium as needed. The doctor explained that Maxzide was a treatment for hypertension.

In subsequent testing, the doctor found the decedent had a small hiatal hernia, uncomplicated diverticula, and gallstones. The decedent complained of chest discomfort at a later visit, which the doctor thought might be angina, and the doctor treated him accordingly; however, the doctor explained that the decedent's symptoms were not classical for angina, but that the decedent had atypical chest pain.

In May 1987, Dr. Lewis had the decedent admitted to the hospital for a cardiac catheterization. This test revealed that the decedent had normal coronary arteries, a normal left ventricle, and normal pressures. In the visits after this test, the decedent complained of fatigue and swelling in his legs, which the doctor explained could be associated with hypertension, and he complained of neck pain and headaches. Dr. Lewis admitted that he had seen the decedent following a car accident for a whiplash injury, and on another occasion, he had treated the decedent for sores in his mouth and for inflammation of the tongue.

Dr. Lewis had reviewed the postmortem examination of the decedent. He described cardiomyopathy as a disease of the muscle of the heart and stated that the term "congestive cardiomyopathy" was a generic term as there can be a lot of causes of this condition. He explained that in congestive cardiomyopathy, the heart does not pump well. Dr. Lewis testified that in his examinations of the decedent, he had found no clinical signs of congestive cardiomyopathy. He further testified that generally there is not a massive progression or a significant progression of heart disease in two years' time. Dr. Lewis could give no opinion as to the cause of the decedent's death. He also stated that in the period of time in which he had treated the decedent, the decedent's health had improved.

On appeal, the respondent argues that the Commission's decision was against the manifest weight of the evidence, as there was no direct or circumstantial evidence, medical or otherwise, to show that the decedent was electrocuted during the course of his employment. The respondent asserts that there were no witnesses to the accident; that the decedent was performing routine maintenance work, work he had performed for almost 30 years; that the elevator was in proper working order; and that the deputy medical examiner's testimony was inconsistent regarding the cause of death. We disagree.

■ The law is that an employee "is engaged in the course of his employment when the injury occurs within the period of his employ-

ment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or is engaged in doing something incidental to it." (*Hunter Packing Co. v. Industrial Comm'n* (1953), 1 Ill. 2d 99, 104, 115 N.E.2d 236, 239.) The proof of injury need not be made by direct evidence, but may also be established by circumstantial evidence which leads to a logical and reasonable inference of a causal connection between the employment and the resulting injury. (*Material Service Corp. v. Industrial Comm'n* (1973), 53 Ill. 2d 429, 292 N.E.2d 367.) We find that the circumstantial evidence presented here was more than sufficient to support the Commission's decision.

■ The evidence presented was that the decedent had gone to work the morning of his death in apparent good health, that he was at work at the College at the time of his death, and that he had gone to the room where the elevator-control panel was located in order to perform routine maintenance on the elevator as his job required. The evidence further established that there was a towel located where the decedent would kneel to work on the control panel, there was a screwdriver laying nearby the decedent, and the decedent's tool pouch was laying near the kneeling towel, indicating that the decedent had begun his work duties. In addition, the evidence was clear that the electrical-control panel was on at the time of the decedent's death, that the control panel had an exposed electrical current, and that the electricity was "arcing" between contact points. The testimony of the witnesses established that a maintenance mechanic was sometimes required to place his hands where the electrical current was, and that electrical shocks were a hazard of this occupation. This evidence, combined with the deputy medical examiner's postmortem examination, provided a strong, reasonable inference that the decedent died as a result of a low-voltage electrocution. The deputy medical examiner's testimony was that, on the basis of the circumstances, it was her opinion that the decedent died as a result of electrocution. Although the deputy medical examiner found evidence of heart disease, she did not determine that this condition was the cause of the decedent's death. The respondent presented no evidence to rebut the deputy medical examiner's evidence. Thus, the Commission's decision was not against the manifest weight of the evidence, and since a reviewing court will not disturb a Commission's decision unless it is against the manifest weight of the evidence (*Beecher Wholesale Greenhouse, Inc. v. Industrial Comm'n* (1988), 170 Ill. App. 3d 184, 524 N.E.2d 750), the Commission's decision must stand.

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Industrial Commission is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and RAKOWSKI, JJ., concur.